758 So.2d 749 (1999)
STATE of Louisiana
v.
Terry Earl CASTLEBERRY, Sr.
No. 98-KA-1388.
Supreme Court of Louisiana.
April 13, 1999.
*752 Gail Schlosser, Jefferson, Patricia A. Thomas, Thomas J. Frederick, Abbeville, for Applicant.
*753 Richard P. Ieyoub, Atty. Gen., Earl B. Taylor, Dist. Atty., Gary C. Tromblay, Houma, for Respondent.
KIMBALL, Justice[*]
This case involves a direct appeal to this court from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The main issues involve: (1) the denial of a continuance based on the defendant's medical problems; (2) the trial court's finding of competency; (3) the denial of a continuance to give the defense experts time to prepare for trial; (4) the refusal of the trial court to give a special instruction on accomplice testimony; (5) the trial court's allegedly encouraging the jury to reach a verdict quickly; (6) the trial court's limiting the testimony of a defense expert; (7) testimony of a State expert that allegedly went to the issue of defendant's credibility; (8) the admission of other crimes evidence; (9) denial of a mistrial based on the admission of unnoticed other crimes evidence; (10) ineffective assistance of counsel; (11) violations of sequestration; and (12) failure to record four bench conferences.[1]

FACTS
In early May of 1996, the defendant, Terry Earl Castleberry, Sr., his brother, B.J. Castleberry, their nephew, Jimmy Austin, and Austin's friend, James Nutt traveled from their home in Motgomery, Alabama to Houston, Texas to look for work. They drove in defendant's truck, and they planned to stay with a friend, Bill Abbott, while in Texas.
Their efforts to secure employment were unsuccessful. Although the Castleberry brothers wanted to stay in Texas, Austin and Nutt wanted to return home to Alabama, and the brothers agreed to bring the other two men home. Consequently, the four men set out to return to Alabama on the afternoon of May 11, 1996.
The men found themselves with insufficient funds to complete the trip, so they stopped at a casino in Lake Charles with the hope of winning more money. This plan was unsuccessful, and defendant then suggested that they "roll a queer" at a rest area to obtain money. Accordingly, they stopped at a rest area to locate a victim.
While they were at the rest area, the four men used the restroom and then separated. B.J. Castleberry picked up a ringing pay phone and began talking to the man who had called the pay phone. He then observed Austin walking toward him with the victim; Austin had one arm around the victim's shoulders and had placed a gun in the victim's back. Austin had already taken the victim's wallet and discovered that the wallet contained, among other items, a card for an automated teller machine (ATM). Austin then suggested they take the victim to an ATM and force him to withdraw money. Defendant agreed with Austin's plan. Before they left the rest area, Austin requested and obtained a roll of duct tape from defendant.
Austin and B.J. Castleberry rode with the victim, in the victim's car, to the ATM. When they got to the bank where the ATM was located, Austin and B.J. Castleberry hid behind two pillars on the front of the bank building while the victim withdrew two hundred dollars from the ATM, which he promptly gave to Austin. While the victim was completing this transaction, defendant drove through the parking lot of the bank, then went to a convenience store, as he and his brother had agreed to meet at the nearest convenience store if they got separated.
During the drive to the ATM, Austin and B.J. Castleberry had questioned the victim about the sort of personal property *754 he owned. Upon learning that he had a television, videocassette recorder, jewelry, and other personal electronics, they decided to go to his house and rob him of these items. They then met up with defendant and Nutt at the convenience store, informed them of the plan, and they all went to the victim's house.
Austin, B.J. Castleberry, and the victim arrived at the house first; defendant and Nutt arrived soon after. The latter two men were wearing gloves when they entered the house. One of the victim's neighbors, Harold Brooks, was in his yard, bagging trash from a cookout. Brooks observed these events and found them suspicious. Accordingly, he retrieved a pencil and piece of paper from his house and recorded the license plate number of the truck after the men went into the house.
After entering the house, Austin brought the victim into his bedroom, made him lie down on his bed, and taped his hands and feet with the duct tape he had gotten from defendant. The victim was also gagged with a sock that was taped into his mouth. When defendant and Nutt arrived, the four men started ransacking the house and bringing items to the truck.
At some point while the men were loading the victim's property into the truck, B.J. Castleberry saw the defendant pick up a cast iron skillet. Defendant began swinging the skillet and talking about putting the victim "to sleep." B.J. Castleberry continued loading items in the truck while defendant was engaging in this behavior. Defendant's brother then returned into the house and heard a loud thump. This thump was the sound made by one of the two blows to the head that the defendant inflicted on the victim with the skillet. These blows were so forceful that they broke the skillet. B.J. Castleberry then brought another item into the truck; when he returned into the house, Austin was standing in the doorway of the victim's bedroom and commented that defendant was killing the victim.
B.J. Castleberry then entered the bedroom. The victim was on the floor, and the defendant was smothering him with a pillow. When B.J. Castleberry told the defendant to stop, the defendant replied that if B.J. Castleberry did not leave the room, he would be the next one "put to sleep." B.J. Castleberry then left the house, and he did not return into the house. The defendant and Austin left the house shortly after, and the group resumed their trip to Alabama. The defendant commented that he had "busted" the skillet on the victim's head, and that he felt good and felt like "putting another one to sleep." The victim died of suffocation and asphyxia.
The four men then drove back to Alabama, picking up a female hitchhiker along the way. When the hitchhiker refused defendant's request for oral sex, he threatened to "put her to sleep" while reaching for the gun in the glovebox. Austin eventually stopped the truck and told her to get out. While in Alabama, they sold or pawned most of the victim's property. The brothers next returned to Houston, where they learned they were wanted for murder. When B.J. Castleberry informed the defendant he was going to turn himself in, the defendant threatened to "put him to sleep" if they were housed in the same cell.
The guilt phase of the trial took place in late October. Several witnesses testified, including B.J. Castleberry and James Nutt. The penalty phase was held in early November, and both B.J. Castleberry and the defendant himself testified at this phase of the trial.
The jury found Defendant guilty of first degree murder and recommended that he receive a sentence of death. The jury's recommendation was based on two separate aggravating circumstances: (1) that the murder was committed in an especially heinous, atrocious, or cruel manner, and (2) that the defendant was engaged in the perpetration or attempted perpetration of *755 aggravated kidnaping, second degree kidnaping, aggravated burglary, armed robbery, first degree robbery or simple robbery. Defendant has appealed both his conviction and his sentence.

LAW AND DISCUSSION

PRE-TRIAL ISSUES

Continuance/ defendant's assignment of error number 3
In this assignment of error, defendant contends the trial court erred when it denied his motion for a continuance based on his deteriorating health and need for surgery to relieve an aortic blockage. The record reveals the trial court held two separate hearings on this issue. The first was held on September 4, 1997, when the defendant's surgery was scheduled for September 10, 1997. The court had completed a telephone conference with the defendant's doctor, and attorneys for both the State and defense immediately prior to the hearing. This conference revealed that the surgery was elective, but that delay in having the surgery could result in an emergency operation or the potential loss of limbs. The defendant's doctor also said that the defendant would be available for trial in October. Accordingly, the court instructed the doctor to perform the surgery. However, the September 10 surgery was not performed, as the defendant's doctors decided that his condition could be managed with exercise and medication and that surgery could wait until the condition deteriorated further.
The defendant filed a second motion for continuance, and a hearing on both this motion and defendant's motion to determine competency was held on September 26, 1997. Several witnesses testified at this hearing. First to testify was Shirley Robin, who worked as a nurse for the St. Landry Parish Sheriff's Department and who was responsible for giving the defendant his medications. Nurse Robin had treated the defendant for almost a year. She stated that defendant had been prescribed numerous medications, which he often refused to take. She had once counted forty occasions in one month when he refused his medicine. She also stated that the defendant had made a request to go to the hospital on the day prior to the hearing, but that he had refused to fill out the necessary forms to proceed with his request.
Next to testify was Dr. James Redmann, a fourth year resident in general surgery who treated defendant; Redmann testified as an expert in medicine with a specialization in surgery. Redmann stated that defendant had a blockage in his aorta and that his symptoms had worsened over time. However, Redmann consulted with other doctors about defendant's condition, and they had decided to control the condition with exercise and medication and postpone surgery until the symptoms worsened. When questioned by the court, Redmann also testified that the defendant's condition was not presently limbthreatening and that, due to the progression of the disease, a delay in trial could result in defendant's physical condition worsening to the point where he was unable to stand trial.
The court denied the motion. Defendant then sought relief through supervisory writs to the third circuit and this Court. Both of these writ applications were denied. State v. Castleberry, 97-1310 (La.App. 3d Cir.10/8/97); State v. Castleberry, 97-2442 (La.10/9/97), 703 So.2d 587. However, the fact that we have previously denied this supervisory writ does not preclude us from considering the merits of this issue in this direct appeal. State v. Fontenot, 550 So.2d 179 (La.1989).
The trial court has great discretion in deciding whether to grant a motion for continuance, and this decision will not be disturbed on appeal in the absence of an abuse of that discretion. State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218; State v. Bourque, 622 So.2d 198 (La. 1993); State v. Sosa, 328 So.2d 889 (La. *756 1976). Even when an abuse of discretion is shown, this Court typically declines to reverse a conviction based on denial of a continuance absent a showing of specific prejudice. Strickland, 683 So.2d at 229; Bourque, 622 So.2d at 223. These standards are applicable when the defendant is seeking a continuance based on his health. State v. Karno, 342 So.2d 219 (La.1977).
In Karno, this Court set out seven "fundamental variables" to guide the trial judge who is considering a motion for continuance based on the defendant's health. Karno, 342 So.2d at 222.
These variables are:
(1) Medical Reports and Judgments The threshold questions are whether the accused is indeed suffering from the disability complained of and whether there is a high risk that forcing the accused to stand trial would seriously endanger his health and/or prevent him from effectively participating in his defense.
(2) Evidence of Defendant's Activities During the Period of Illness;
(3) Possible Availability of Measures to Minimize the Risk to Defendant's Health in Subjecting Him to Trial;
(4) Whether the Accused Will be Better Able to Stand Trial at a Later Date;
(5) The Degree of Injury to the Public Interest Deemed to Result from Delay or the Total Preclusion of a Trial;
(6) The Effect of Defendant's Physical Condition on His Constitutional Rights; and
(7) The Presumption of Innocence.
Karno, 342 So.2d at 222-223.
In the instant case, an analysis of the Karno factors shows that the trial judge did not abuse his vast discretion in denying the defendant's motion for continuance based on his medical condition. Although the fact of defendant's aortic blockage was uncontroverted, the evidence presented at the hearing did not show that this condition had deteriorated to the point where forcing him to stand trial would seriously endanger his health or interfere with his constitutional rights. Rather, the evidence showed that his medical problems could be controlled with exercise and medication and that surgery was unnecessary at that time.[2] This conclusion is bolstered by an examination of the record, which shows both that defendant was present during all parts of trial and that he testified extensively on his own behalf during the penalty phase. The fact that defendant often refused his medication and also refused to fill out the necessary paperwork to fulfill his request to go to the hospital further supports this conclusion.
Redmann testified that narcotic painkillers, one of which had been prescribed for defendant's pain, can affect the thought processes. However, Redmann also testified that defendant's medication, Lortab, was one of the mildest narcotics available and that non-narcotics could be prescribed to relieve his pain. Thus, there were measures available to minimize the risk to defendant's health while simultaneously safeguarding his constitutional rights.
Redmann also testified that defendant's condition could eventually worsen to the point where he was unable to stand trial. Thus, there was a risk that a delay in trial would result in the preclusion of trial.
Finally, the fact that defendant testified on his own behalf demonstrates his ability to assist with his defense, and nothing in the record indicates that his condition interfered with the exercise of any of his constitutional rights.
This analysis of the Karno factors indicates that the trial judge did not abuse his vast discretion in denying defendant's motion *757 for a continuance based on his medical problems.
This assignment of error thus lacks merit.

Competency/ defendant's assignment of error number 4
In this assignment of error, defendant contends the trial court erred by finding him competent to proceed and denying his request for a sanity commission.
The record reveals defendant argued that he was so preoccupied with his medical condition as to be incompetent to stand trial. As noted supra, in the discussion of defendant's assignment of error number 3, the trial judge held a hearing on this issue on September 26, 1997, contemporaneous with the hearing on the motion to continue. In addition to Nurse Robin and Dr. Redmann, the court also heard testimony from Thomas Frederick, defendant's attorney, Dr. Friedberg, defendant's psychologist and expert witness, and Deputy Calvin Moore.
Nurse Robin testified that she had taken the defendant's blood pressure and blood sugar the day before the hearing and had spoken with him while doing so. She testified that he had spoken about his lawyer and said he was in pain. Defendant was also coherent and alert during this time. He appeared oriented and could carry on a conversation about his family. He knew that he was incarcerated, and he also knew that he was from Montgomery.
Dr. Redmann testified that the defendant had always seemed coherent and was always able to communicate effectively with the doctor about his medical problems.
Dr. Friedberg testified that he had interviewed the defendant in August of 1997 and again in September of 1997. Dr. Friedberg felt that the defendant was capable of assisting in his defense at the time of the August interview, but that his condition had deteriorated as of the September interview. During the latter interview, defendant seemed preoccupied with his health and would not talk about the case against him, but only about his medical problems. However, Friedberg also testified that the defendant was coherent, aware that he was incarcerated for capital murder, and seemed aware of his legal rights during the latter interview. The defendant also seemed aware that the trial, which was then set for October 1, was quickly approaching, and appeared to be aware of the consequences of a guilty verdict. Friedberg was unable to reach a definite opinion regarding whether the defendant was able to assist in his defense, and suggested that a different professional examine the defendant to determine whether he could provide assistance to his attorneys. Friedberg was, however, able to state definitively that the defendant was aware of the proceedings against him.
Thomas Frederick, defendant's attorney, testified that the defendant's ability to assist with his defense had deteriorated since August. Frederick stated that during his most recent interview with the defendant, which was on September 12, 1997, the defendant constantly steered the conversation back to his health problems and would not respond to questions that needed to be discussed for purposes of his defense. Frederick also testified that the defendant had not recently been able to discuss the facts of the case and that the defendant would not go over other witnesses' statements, preferring instead to talk about his medical complaints.
However, Frederick also testified on cross-examination that the defendant was alert and coherent during the interview and seemed as aware of his legal rights as any of Frederick's other clients. Frederick also testified that the defendant seemed to understand that he was facing capital murder charges and could receive the death penalty if found guilty.
Deputy Calvin Moore, a Deputy Sheriff with the St. Landry Parish Sheriff's Department, also testified at the hearing. Moore had talked to the defendant on the *758 day prior to the hearing, when he took pictures of the defendant pursuant to a request by the defense attorneys. Moore testified that he retrieved defendant from his cell on the third floor, and that they then walked to the booking area on the first floor. The defendant walked normally during this time, was alert and coherent, and did not complain about pain or appear to be in pain. When Moore and the defendant were in the booking area, they discussed an event that had occurred a month earlier, and the defendant's account of the event was the same as the one that he had given Moore the previous month, when he first spoke with Moore about the event. Moore rebooked the defendant after the picture was taken, and the information that the defendant provided at the rebooking was the same as the information that he had originally given at the first booking.
Finally, the State introduced into evidence the report of its expert psychiatrist, Dr. Seiden. The defense objected to the report as hearsay, but the court properly overruled the objection in accordance with La.C.E. art. 1101(B)(8).[3]
After careful consideration of the evidence, the trial court found that the defendant possessed the requisite mental capacity to proceed and denied his motion for appointment of a sanity commission.
"Mental incapacity to proceed exists, when as a result of a mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La.C.Cr.P. art 641. The trial court has great discretion in ruling on a determination of competency, and his decision will not be overturned on appeal absent abuse of this vast discretion. State v. Comeaux, 514 So.2d 84 (La.1987); State v. Lowenfield, 495 So.2d 1245 (La.1985); State v. Rogers, 419 So.2d 840 (La.1982). Further, the appointment of a sanity commission "is not a perfunctory matter or a ministerial duty of the trial court and is not guaranteed to every accused in every case." State v. Sepulvado, 672 So.2d 158 (La. 1996); State v. Nix, 327 So.2d 301, 323 (La.1975). Finally, although the trial court may consider expert medical testimony on the issue of competency to stand trial, the ultimate decision on the issue of competency shall be made by the court alone. State v. Perry, 502 So.2d 543 (La. 1986); State v. Lowenfield, 495 So.2d 1245 (La.1985); State v. Rogers, 419 So.2d 840 (La.1982).
In State v. Bennett, 345 So.2d 1129 (La.1977), we enunciated a number of factors that should be considered in deciding whether an accused is competent to stand trial:
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate his seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is *759 able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
State v. Perry, 502 So.2d 543 (La.1986) citing State v. Bennett, 345 So.2d 1129, 1138 (La.1977).
An examination of these factors shows that the trial court did not abuse its vast discretion in finding defendant competent to stand trial and denying the motion for appointment of a sanity commission. Several witnesses testified that defendant was alert, coherent, and cognizant of his surroundings, his legal predicament, and his legal rights. As noted by the trial court, the fact that defendant made the decision to have surgery indicates that he was fully capable of making important decisions, and defendant did in fact testify in his own defense at trial. Notably, only the defense witnesses suggested that defendant was unfit to stand trial, and Friedberg could not even definitively opine that defendant was incompetent, choosing instead to request that someone else examine him to reach an opinion on that issue. While Frederick suggested that defendant might not be able to assist in his defense, Frederick also admitted that defendant seemed aware of his legal problems. The impartial witnesses, however, uniformly portrayed defendant as a man who was well aware of his troubles and could assist his attorneys.
Because the Bennett factors show that the trial judge did not abuse his discretion in finding the defendant competent and denying his motion for appointment of a sanity commission, this assignment of error lacks merit.

Continuance/ defendant's assignment of error number 5
In this assignment of error, defendant contends that the trial court erred when it granted him a continuance of only two weeks to allow his experts to prepare for trial.
The trial court initially denied the defendant's two motions requesting funds for expert witnesses. The defendant then sought writs in the third circuit. That court ordered the trial court to hold a hearing in accordance with State v. Touchet, 642 So.2d 1213 (La.1994) to determine whether defendant should receive funds for an expert, but denied defendant's request for a continuance. State v. Castleberry, 97-1213 (La.App. 3d Cir.9/24/97). The defendant next sought review of the denial of the stay in this Court. We denied the request for a stay, but partially granted the writ and directed the trial court to continue the trial to the extent necessary to allow the defense experts to prepare for trial if the defense was granted funding for experts. State v. Castleberry, 97-2307 (La.9/29/97), 701 So.2d 179.
Accordingly, the trial judge held a phone conference with attorneys for both the defense and the State. During this conference, the trial judge ascertained that one of the defense experts was not available until October 15. Accordingly, the start of trial was moved from October 1 to October 15. The defendant now alleges that this two week continuance was insufficient.
The trial court has great discretion in deciding whether to grant a continuance, and its ruling will not be overturned absent an abuse of discretion. State v. Bourque, 622 So.2d 198 (La.1993); State v. Champion, 412 So.2d 1048 (La.1982); La. C.Cr.P. art. 712. Further, we generally will not reverse a conviction due to an improper ruling on a continuance unless there is a showing of specific prejudice to *760 the defendant as a result of the denial of the continuance. State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218; State v. Knighton, 436 So.2d 1141 (La.1983).
Given that the defense attorney said that the expert would be available on October 15, the trial court did not abuse its discretion in continuing the trial until that date. Further, defendant's brief does not demonstrate, and we cannot discern from the record, any specific prejudice that was suffered as a result of the denial. Thus, this assignment of error lacks merit.

TRIAL ISSUES

Requested jury instruction on accomplice testimony/ defendant's assignment of error number 7
In this assignment of error, the defendant contends the trial court erred when it declined to give his requested jury instruction regarding accomplice testimony, as B.J. Castleberry testified against him pursuant to a plea agreement.[4] This plea agreement was made known to the jury.
The defendant's requested charge was:
An accomplice is defined as one who is associated with another in the commission of a crime.
An accomplice is a competent witness, wither [sic] for the State or for the defendant, whether he has been convicted or not, or whether he has pleaded guilty, or dismissal entered as to him, or whether he be joined in the same information or indictment with the person on trial or not.
Corroboration is desirable, but not always indispensable; the jury may convict on his uncorroborated testimony, and while it is not the rule of law, it is rather the rule of our experience, in dealing with that class of testimony, that while you may convict upon the uncorroborated testimony of an accomplice, still you should act upon his testimony with great caution, subject it to a careful examination in the light of the other evidence in the case, and you are not to convict upon such testimony alone, unless satisfied, after a careful examination of its truth, and also that you can safely rely on it.
What the law means by corroboration of the testimony of an accomplice is not merely the corroboration of the accomplice's narrative and the mere details of how the crime charged was committed, but some real and independent corroboration tending to implicate the defendant in the commission of the offense charged.
It is not sufficient to corroborate an accomplice as to the facts of the case generally. He should be corroborated as to some material fact which tends to prove that the accused was connected with the crime charged. The corroboration that merely raises a suspicion of guilt, because the accused had an opportunity to commit the offense is not sufficient.
While the trial judge did give the first two paragraphs of the requested charge, he refused to give the rest of the charge on the basis that it was argument. Instead, he gave the following charge:
As jurors, you alone shall determine the weight and credibility of the evidence. As the sole judges of the credibility of the witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony given and the circumstances under which the witnesses testified.
Now, in evaluating the testimony of the witness you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the State or the defendant and the extent *761 to which the testimony is supported or contradicted by other evidence.
The testimony of a witness may be discredited by showing that the witness made a prior statement which contradicts or is inconsistent with his present testimony and such prior statements are admitted only to admitattempt to discredit the witness and not to show that the statements are true.
Also the testimony of a witness maybe [sic] discredited by showing that the witness previously was convicted of a crime. The conviction does not necessarily mean that the witness is failing to tell the truth. It is a circumstance you may consider along with all other evidence in deciding whether or not you're gonna believe the testimony of a witness.
The testimony of a witness may also be discredited by showing that the witness will benefit in some way by the defendant's conviction or acquittal and that the witness has any other reason or motive for not telling the truth.
An accomplice is defined as one who is associated with another in the commission of a crime.
An accomplice is a competent witness, either for the State or for the defendant, whether he has been convicted or not, or whether he has pleaded guilty, or dismissal entered as to him, or whether he be joined in the same information or indictment with the person on trial or not.
"A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." La.C.Cr. P. art. 807. The trial judge should charge the jury to regard an accomplice's testimony with "great caution" when the accomplice's testimony is uncorroborated; when the accomplice's testimony is materially corroborated, the special instruction is not mandatory. State v. Schaffner, 398 So.2d 1032 (La.1981); State v. Washington, 407 So.2d 1138 (La.1981); State v. Murray, 375 So.2d 80 (La.1979). For an accomplice's testimony to be materially corroborated, "it is enough if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation." Schaffner, 398 So.2d at 1035, citing United States v. Lee, 506 F.2d 111 (D.C.Cir.1974).
In the instant case, there is one particularly compelling piece of evidence that confirms B.J. Castleberry's extensive testimony. Crystal Nutt testified that the defendant had told her that he committed the murder. Further, other evidence confirms certain points in B.J. Castleberry's testimony. Harold Brooks' account of the four men arriving at the victim's home is consistent with B.J. Castleberry's account of the arrival. The security tape from the ATM shows two men hiding behind pillars, and a dark truck driving through the parking lot and is also consistent with the testimony of B.J. Castleberry. Bank records confirm that the victim made an ATM withdrawal at the approximate time and in the amount that B.J. Castleberry said he did. Wanda Hughes testified that defendant and B.J. Castleberry sold her the victim's VCR, and Carol Snell testified that defendant sold her the victim's television set, as B.J. Castleberry had testified. Finally, the skillet was broken, as B.J. Castleberry had testified.
Defendant argues that, despite all of the aforementioned corroborating testimony, the accomplice instruction still should have been given, as the single most compelling piece of evidence came from Crystal Nutt, who was James Nutt's sister and Austin's ex-girlfriend. She was also pregnant with Austin's child at the time of the murder. However, the jury was fully apprised of both her relationships to the other defendants and her medical condition. Further, the general charge informed the jury that they had the prerogative to believe or *762 disbelieve the testimony of any witness, and they could consider the witness' motive for testifying when exercising this prerogative.
Because all of the aforementioned evidence corroborates B.J. Castleberry's testimony, the trial court did not err in refusing the requested jury charge. Further, the jury was informed of possible reasons that B.J. Castleberry, Crystal Nutt, and James Nutt could have for falsely testifying against the defendant, and the general charge properly instructed the jury that they could consider any reason that any witness could have for so testifying against the defendant.
Thus, this assignment of error lacks merit.

Pressure on the jury/defendant's assignment of error number 11
In this assignment of error, the defendant contends that the trial court erred when it pressured the jury to reach a verdict quickly, thereby leading the jury to believe it had a deadline for reaching a verdict. The defendant urges this error as to three statements by the trial court.
The first such statement was made at the end of the second day of the guilt phase of the trial:
Okay. Members of the jury we're going to break for supper and you're going to get the guilt phase of this tomorrow. I'm satisfied of that. Sometime tomorrow you're going to be called upon to decide. What time of day, I don't know but you're gonna do it tomorrow. After you do that, we're going to make some decisions, depending on how you come back and with what type of verdict you come back. We can't make those decisions at this time and I'm not going to make any predictions, so with that, have a good nights [sic] rest and we'll see you at 8:30 in the morning.
The second statement was made immediately prior to closing arguments in the guilt phase of trial:
Once theythe State completes its argument, then the Defense presents an argument and then the State comes back and they offer a rebuttal argument. And uh, after that's done then I'm going to charge you with the law that applies in this case and you're going to retire to deliberate. Looking at this thing, by the time the lawyers get through arguing, we're gonna talk again and I'm gonna askfind out from you if you wanna go get a little bite to eat because I think ya'll are anxious to get this part of the case over with. Okay. So, we'llwe're gonna finish this part tonight or at least we're gonna get into it where its on it's way to being finished.
The final disputed statement was made immediately after the guilty verdict was rendered:
We'll get a running start early Monday morning and we're gonna try and get this thing over with Monday. I think that we can by going into the night like we did tonight. I think that Monday should be the last day here. I think that we can, from what I've talked to these lawyers about what evidence they have to present, that I think that the evidence can be presented in ain a day or early into the night and we'llwe'll finish this thing up atat night.
Defense counsel did not contemporaneously object to any of these statements. We have previously held that we will not consider alleged errors committed during the guilt phase of a capital trial unless trial counsel contemporaneously objected to those alleged errors. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 ("This Court's scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not.") Because the first two statements occurred during the guilt phase and were not objected to, they are precluded under Taylor.
*763 However, even had defense counsel lodged contemporaneous objections, relief still would not be warranted, as these statements do not truly encourage the jury to rapidly reach a verdict, as the defendant contends. Rather, the statements are merely comments by the judge on the quantity of evidence to be presented at the penalty phase and the amount of time he expected the presentation of this evidence to take.
The third statement arguably could be considered as occurring after the guilt phase. However, even assuming arguendo that this statement is not precluded by Taylor, it, like the other two statements at issue in this assignment of error, does not constitute error. This statement is also a comment on the quantity of the evidence and not a forbidden instruction to the jury to rapidly reach a verdict.
This assignment of error thus lacks merit.

PENALTY PHASE ISSUES

Expert testimony/ defendant's assignment of error number 29
In this assignment of error, defendant contends the trial court erred when it limited the testimony of his expert during the penalty phase.
The record reveals that the expert, Patrick Kent, was accepted by the court as an expert in the field of "evaluation, research and treatment of alcohol and drug abuse," even though the defense attorney originally tendered the witness as an expert in "substance abuse, research and treatment, and its effect on the human being." Kent has a master's degree in clinical psychology and is a licensed psychotherapist. He is also the southeast regional director for alcohol and drug abuse for the state of Louisiana. His master's thesis was written on race relations, and he has published two articles, one on treatment retention and one on the effectiveness of different types of treatment. He has also published papers on "the treatment of forensic cases in association with alcohol and drug abuse and addiction," spoken at various professional conferences and served as a consulting fellow for the National Institute of Justice. His current position involves supervising various professionals in the field of alcohol and drug abuse.
The defendant complains of two separate instances in which the trial court limited Kent's testimony, both of which occurred in relation to questioning from the defense attorney:
Q. What effect did his drinking and drug taking have on his behavior on the day of this offense?
Mr. Richard: Objection. That's outside of his expertise.
The Court: The objection is sustained.
Q. DoctorMr. Kent, in your treatment and research of persons who abuse alcohol or other substances, are some of these individuals or any of these individuals able to continue functioning in what is an apparently normal manner even though they have ingested large quantities or [sic] whatever it is they're abusing?
A. Well certainly more normal than you or I. There's an accommodation as a regimentation of behavior that is not uncommon in alcoholics. In fact, it's common where people drink over an extended period of time and they learn to walk and talk and behave more or less normally. Their mentation, their mental processes are not accommodated that way. There is more effect that is on the mental functioning than there is on physical functioning with alcoholics.
Q. So they can walk, talk, drive and still be
A. More or less they would certainly, but certainly a lot better than their thinking and feeling.
Mr. Richard: I think what weexcuse me, Mr. Kent, but I think now we've gotten out of the area of expertise.
The Court: The objection is sustained.
*764 The defendant does not specify what the substance of Kent's testimony would have been in response to these questions. However, to the extent that the questions appear designed to elicit testimony on the physiological and biological effects of substance abuse on the human body, the objections were properly sustained. Kent's expertise, as shown by his qualifications, did not extend to this arena, but was specifically limited to the evaluation, research, and treatment of substance abuse. Thus, the expert lacked the requisite "knowledge, skill, [or] experience" to testify about the physical effects of substance abuse on the functioning of the human body. La.C.E. art. 702.
This assignment of error thus lacks merit.

Expert testimony/ defendant's assignment of error number 30
In this assignment of error, defendant contends the trial court erred when it allowed a State expert, Dr. George Seiden, to testify about the defendant's credibility and make a reference to whether the defendant would testify.
The record reveals that the testimony complained of was in response to a question from the State's attorney regarding a part of Seiden's written report on the defendant:
Q. One last sentence which is on page six, the second to last line. You said he has the ability to maintain a consistent defense. What do you mean by that?
A. Just that, that if he has to testify that he could and that he would be consistentthat he would tell the same story. He has the ability to tell the same story each time. Whether he would or not is another matter. But he is able to maintain a consistent defense.
Ms. Thomas: Your Honor, I believe that this witness just addressed a credibility issue and I'd like
The Court: The objection is overruled.
The defendant submits that "[t]he intended effect upon the jury of the above colloquy was for the jury to infer that if the defendant did not testify, it was because he would be lying, and that if the defendant did testify, he probably would not be telling the truth." The defendant thus contends that the testimony at issue unfairly placed a credibility determination before the jury prior to defendant taking the stand. However, the record shows that defendant testified before Seiden. Thus, Seiden's testimony had not yet been heard by the jury when it considered defendant's testimony. Further, the testimony at issue does not go to credibility, as it does not address whether defendant was in fact telling the truth. Rather, the testimony at issue in this assignment of error addresses defendant's ability to tell the truth, not whether he was in fact telling the truth. The testimony also elaborates upon and explains Seiden's statement that defendant "would tell the same story each time." Consequently, the testimony at issue is not truly a credibility judgment by Seiden.
This assignment of error thus lacks merit.

Other crimes evidence admitted through hearsay/ defendant's assignment of error number 18
In this error, defendant asserts that the trial court erred when it allowed B.J. Castleberry to testify about an unadjudicated crime involving the defendant (the "hitchhiker incident") that occurred shortly after the victim's death, when the men were returning to Alabama. Defendant argues both that this testimony involves prohibited hearsay and that it was inappropriately admitted because it was not evidence of violent conduct.
The record shows that the trial court conducted a preliminary hearing to determine whether B.J. Castleberry's testimony about the incident would be admissible. At this hearing, the court watched an excerpt from a videotaped statement given by the witness. The statement provided, in pertinent part:

*765 And then all of a sudden the truck stopped on the side of the interstate and me and Spunk raised up and this girl got in the front seat with Jimmy and Terry. Terry was driving at the time and she got in the middle and Terry kept telling herher eye was black and her leg was skinned up a little bit and Terry kept telling her that he wanted her to give him a blow job.
Mr. Rivette: Excuse me how do you how docould you hear that from inside?
Mr. Castleberry: Yes, Iyeah because 
Mr. Rivette: Ya'll had a little sliding door, sliding window?
Mr. Castleberry: Sliding window.
Mr. Rivette: Okay.
Mr. Castleberry: We heard this. And he kept on hinting and she told him no and I don't think she realized what he was hinting about but we knew what he was talking about, about putting her to sleep. And then Jimmy told him to pull over and let him drive. And so Jimmy got to driving and Terry kept on reaching for the dash. That's where the little.25 automatic was which belonged to Jimmy and Jimmy reached over there and pushed the dash back up and then Jimmy finally got tired and just pulled over and told the girl to get out and so she got out and we went home and that's the last time we saw her. And we dropped Jimmy and him off and then we went back to Texas.
The court ruled the evidence admissible, noting that:
However, we do have this, he's testified and a jury apparently has believed him. He sounded believable to me and while I wouldn't want him as a neighbor that doesn't mean he's not acceptable as witness. And I find that his past [sic] credibility muster, consequently, his testimony with respect to that particular unadjudicated offense will be admitted, limited, however, to its occurrence and without any specific detail.
Accordingly, the jury was allowed to hear B.J. Castleberry's testimony about the "hitchhiker incident." This testimony substantially comported with the recorded statement.
"`Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.C.E. art. 801(C). However, statements that "are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive, and spontaneous words and acts of the participants, and not the words of the participants when narrating the events, and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction" are part of the res gestae and are not hearsay. La.C.E. art. 801(D)(4). In Louisiana, the "`res gestae' doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evidenced under the circumstances." State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865.
In the instant case, the "hitchhiker incident" comprises one event in the "continuous transaction" that was the trip from Houston to Montgomery. These events, which included the stops at the casino and the victim's house as well as the hitchhiker incident, were temporally close, for the entire trip only took approximately thirteen hours. The events were also logically related, as they were all different incidents that occurred during the trip. Because the "hitchhiker incident" is part of this continuous transaction, it is part of the res gestae and is not hearsay. Further, a witness' testimony about his observations does not constitute "a statement, other *766 than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted" and is not hearsay. Thus, B.J. Castleberry's testimony about the incident was not hearsay and was properly admitted.
"The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members." La.C.Cr.P. art. 905.2(A). "The character of a defendant convicted of first degree murder is automatically at issue in the sentencing phase of the trial, whether the defendant has placed character in issue or not." State v. Bourque, 622 So.2d 198 (La.1993). See also State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810; State v. Jackson, 608 So.2d 949 (La.1992). "Evidence of unadjudicated crimes is relevant and probative evidence of a defendant's character and propensities in the penalty phase of a first degree murder trial." Connolly, 700 So.2d at 820.
There are, however, jurisprudential guidelines that must be followed before evidence of a prior unadjudicated crime may be admitted. In State v. Brooks, 541 So.2d 801 (La.1989), we enunciated a three-part test to be used in determining whether evidence of unadjudicated crimes should be admitted in the penalty phase of a first degree murder case. Accordingly, the Brooks court determined that this evidence can be admitted if: "(1) the evidence of defendant's connection with commission of the unrelated crimes is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is the focus of the sentencing hearing under La.C.Cr.P. art. 905.2" Brooks, 541 So.2d at 814.
We next addressed the issue of admission of unadjudicated crimes in State v. Jackson, 608 So.2d 949 (La.1992). In Jackson, we reaffirmed our holding in Brooks, but we also added the requirement that the prior unadjudicated crime sought to be introduced must also involve "violence against the person of the victim." Jackson, 608 So.2d at 955. Further, the period of limitations for instituting prosecution against the defendant for the unadjudicated crime must not have run at the time of the indictment for the first degree murder for which the defendant is being tried. Id.
We imposed yet another restriction on the admission of other crimes evidence in the penalty phase of a first degree murder trial in State v. Bourque, 622 So.2d 198 (La.1993). In Bourque, we held that "[i]ntroduction of evidence beyond that necessary to show criminal conduct has been committed and that the defendant has been accused of or connected to that criminal conduct, as well as some minimal evidence in support of these allegations, impermissibly shifts the focus of a capital sentencing jury from considering the character and propensities of the defendant to a determination of guilt or innocence of the unadjudicated criminal conduct." Bourque, 622 So.2d at 248. In Bourque, we reversed the defendant's death sentence and remanded the case to the district court for a new trial, as eleven of the twelve state witnesses at the penalty phase testified about an unadjudicated murder allegedly committed by the defendant. This testimony effectively turned the penalty phase into a forbidden "mini-trial" on the issue of whether the defendant had committed the other crime. Thus, under Bourque, only "minimal" evidence of the unadjudicated crime could be admitted in the penalty phase.
In State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, however, we overruled the Bourque restriction of "minimal" evidence of the unadjudicated crime. Rather than placing quantitative limits on the amount of evidence that could be introduced about the unadjudicated crime, in *767 Comeaux we instead held that the pertinent inquiry was whether arbitrary factors had been injected into the sentencing phase through the introduction of other crimes evidence. To this end, we cautioned:
the judge in the capital sentencing hearing should exclude evidence which, because of its cumulative or repetitive nature, has only marginal relevance and probative value. Moreover, the judge, having already ruled at the pretrial hearing on the admissibility of evidence of the unadjudicated conduct, should cautiously consider the quantum of evidence necessary to convey the message to the jury that the defendant has engaged in other serious criminal conduct that the jury should consider in its determination of sentence, without shifting the jury's focus from its function of determining the appropriate sentence in the capital case to a focus on the defendant's involvement in other unrelated conduct.
In the instant case, we cannot say that the trial judge erred in admitting evidence about the "hitchhiker incident." After viewing B.J. Castleberry's videotaped statement, we agree with the trial judge's assessment of his credibility and cannot say that he erred in finding clear and convincing evidence of the "hitchhiker incident," or in considering this evidence competent and reliable. As the trial court noted, the jury's guilty verdict indicates that the jurors found B.J. Castleberry to be a credible witness. The incident is also relevant and has substantial probative value to show defendant's character and propensities, as the evidence shows that defendant's threat of putting the hitchhiker "to sleep" is the same phrase that he used shortly before murdering the victim. The defendant also threatened to put B.J. Castleberry "to sleep" upon learning that B.J. Castleberry was going to turn himself in to the police. These threats, combined with the defendant's demands for oral sex, show that defendant committed an attempted aggravated oral sexual battery against the hitchhiker. See La.R.S. 14:27, 14:43.2.
Further, as an attempted aggravated oral sexual battery, the incident involved violence against the person of the hitchhiker and, as it occurred only hours after the murder at issue in this case, the period of limitations for prosecution of the battery had not run when defendant was indicted for the crime at issue here.
Moreover, the evidence admitted at the penalty phase about the incident did not inject any arbitrary factors in the trial. B.J. Castleberry provided a succinct account of the incident, and this account was not much longer than the above-quoted excerpt from his statement. Thus, because the admission of the hitchhiker incident comports with the requirements for admission of unadjudicated other crimes, we cannot say the trial judge erred in admitting this evidence.
Finally, even assuming the court erred when admitting this testimony, the verdict was surely unattributable to this error. The details of the incident were minimal when compared to testimony from defendant's ex-wife, who testified that three weeks before the instant offense, defendant abducted her from Kansas City, Missouri, threatened to "blow [her] fucking brains out," made her drive to a remote area, forced her to perform oral sex, and then raped her.
This assignment of error thus lacks merit.

Unnoticed other crimes evidence/ defendant's assignment of error number 14
In this assignment of error, defendant contends that the trial court erred when it denied his motion for a mistrial following the admission of unnoticed other crimes evidence.
The record shows this evidence was admitted through the testimony of Dr. George Seiden, who was admitted by the court as an expert in the fields of general psychiatry and forensic psychiatry. The *768 State introduced the testimony of Dr. Seiden, who had conducted a seventy-five minute interview with the defendant at the Caddo Correctional Center, to rebut the testimony of Patrick Kent. Kent testified as to the defendant's "long history of alcoholism," the effects of alcohol abuse, and the connection between alcohol abuse and violent behavior. During Seiden's testimony, the prosecutor asked him:
Q. Did he ever admit or deny any physical aggressive behavior during the time he was takingusing alcohol?
A. He told me that towards the end of his first marriage he became verbally abusive but he denied physical abuse. He told me that earlier in his life he had several arrests for assault but he said those were not alcohol related. And so
The attorneys then approached the bench. The defense moved for a mistrial, which was denied.
La.C.Cr.P. art. 770(2) provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La. C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown. State v. Banks, 96-2227 (La.4/18/97), 692 So.2d 1051; State v. Comeaux, 514 So.2d 84 (La.1987); State v. Nelson, 459 So.2d 510 (La.1984).
Because the reference to unnoticed other crimes was not made by the judge, district attorney, or any other court official, the mandatory mistrial provisions of this article do not apply. La.C.Cr.P. art 770; State v. Wingo, 457 So.2d 1159 (La. 1984).
Seiden's testimony about the arrests for assault did indeed constitute admission of unnoticed unadjudicated crimes. However, while "notice and a determination by the trial court that the evidence is admissible" are usually prerequisites to the introduction of prior unadjudicated crimes during the penalty phase of a first degree murder case, "Jackson indicates that these evidentiary limitations are not applicable to the state's case in rebuttal." State v. Tyler, 97-0338 (La.9/9/98); 723 So.2d 939, citing State v. Jackson, 608 So.2d 949 (La. 1992). Thus, the fact that the assault arrests were unnoticed becomes relevant only if they were not proper rebuttal evidence.
Rebuttal evidence is "that which is offered to explain, repel, counteract, or disprove facts given in evidence by the adverse party." Tyler, 97-0338 at p. 12, 723 So.2d at 948. The issue of what constitutes rebuttal evidence and is therefore admissible lies within the sound discretion of the trial court. State v. Huizar, 414 So.2d 741 (La.1982).
In the instant case, the trial judge, although denying the defense request for a mistrial, also suggested that the prosecutor "plow in a different field," thus seemingly finding the arrests at issue improper rebuttal evidence. We cannot say that this decision was an abuse of his discretion, as these arrests did not directly shed light on the issue of whether the defendant became more violent when drinking. Thus, the arrests were improperly admitted, for they were neither noticed nor proper rebuttal evidence.
The defendant is not, however, entitled to a mistrial simply because testimony of these arrests was improperly admitted, as the improper admission of evidence of other crimes is subject to the harmless error standard. Tyler, 97-KA-0338 at p. 11, 723 So.2d at 946, citing State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. *769 An error is harmless if "the verdict rendered was surely unattributable to the error." State v. Koon, 96-1208 (La.5/20/97) 704 So.2d 756, 763; see also Bourque, 622 So.2d 198, 241 n. 20.
In the instant case, the death sentence imposed upon the defendant was surely unattributable to Seiden's mention of the arrests for assault. Seiden provided no details about these arrests, and this testimony pales in comparison to that of B.J. Castleberry and the defendant's ex-wife, Roma Eslick. Ms. Eslick testified that the defendant had kidnaped and raped her at gunpoint three weeks prior to the murder that is the subject of this case. In addition, the defendant himself took the stand and testified about his prior crimes, which included burglary, sexual misconduct, embezzlement, and driving under the influence. Given this latter testimony, defendant's sentence was surely unattributable to Seiden's mere mention of the assault arrests. Thus, even though the admission of the testimony about the arrests was erroneous, it was harmless error.
This assignment of error thus lacks merit.

MISCELLANEOUS ASSIGNMENTS OF ERROR

Ineffective assistance of counsel/ defendant's assignment of error number 35(A)
In this assignment of error, defendant contends that his trial counsel committed reversible error by not encouraging him to accept the prosecutor's offer to plead guilty to first degree murder and receive a life sentence. Defendant argues that trial counsel should have realized this was the best offer he was likely to receive, and she provided ineffective assistance by advising him that a better offer was likely forthcoming.
Ineffective assistance of counsel claims are usually addressed in post-conviction proceedings, rather than on direct appeal. State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660; State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651. We have, however, addressed the issue on direct review if the evidence needed to decide the issue may be found in the record. State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250; State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382.
The record in this case does not contain the evidence necessary for us to consider this issue. Thus, this assignment of error is relegated to post-conviction proceedings.

Violations of Jury Sequestration/ Defendant's Assignments of Error numbers 12, 13, 21 and 22
In these assignments of error, the defendant alleges the trial judge committed reversible error when it allowed various violations of the sequestration order.
The first alleged violation occurred when the judge allowed the jurors to have supervised family visits on the weekend. These visits were pursuant to an unpublished court rule of the 27th Judicial District, and the trial judge issued a per curiam to address this assignment of error:
The Court received the defendant's assignments of error on June 9, 1998.
The Court considers it necessary to specially address assignments of error numbered 12, 21, and 22 which address supervised weekend family visitation with the jurors. Beginning with the case of State v. Smith, a capital case, this Court instituted procedure which permitted sequestered jurors to visit with family members under a well defined procedure. This procedure is in place in the 27th Judicial District as an unpublished court rule. A copy of the rule is attached. A copy should already be in the record. This procedure was approved by the Louisiana Third Circuit Court of Appeal in State v. Smith, 96-261 (La.App. 3 Cir.12/30/96), 687 So.2d 529 (La.App. 3 Cir.1996), writ denied 97-0314 (La.6/30/97), 696 So.2d 1004.
The record in this case will confirm that the procedure of the rule was followed, *770 and the spirit of the rule of sequestration was followed.
The rule provides:
REGULATIONS FOR FAMILY VISITS IN CAPITAL CASES
We, the undersigned judges of the 27th Judicial District Court, establish the following regulations regarding family visits in capital cases:
A. Availability, Communication

1. The Court shall announce to the selected jurors that week-end family visits with family members will be available to them.
"Family members" as used in this context means:
Father, mother, husband, wife, or child.
2. The deputy in charge of a sequestered juror or his or her immediate supervisor shall make contact with the juror's family member and inform the family member that week-end visitations will be made available.
B. When Permitted

Family visits shall be made on Sundays. However, Saturdays may be used when available. But only one visit per week-end will be permitted.
C. Procedure During Visits

1. There can be no exchange between the juror and family members of any
a. written communication,
b. videos,
c. pictures, or
d. taped messages.
However, jurors can receive clothes and money from family members. These items must be inspected by the deputy in charge.
The clothes have to be inspected by the deputy for messages, writings, or other communications.
2. Group visits are prohibited.
3. During visits the jurors and family members have to be monitored by a deputy from the beginning to the end of the visit.
4. All visits are limited to thirty (30) minutes or less. The time allotted should be reasonable under the circumstances.
5. The deputy shall instruct the jurors and their family members that the case cannot be discussed or even mentioned in their conversation.
D. Insurance of Compliance

The first working day following family visits, the presiding judge shall interrogate each juror, separately, on the record and ascertain:
1. What matters were discussed during the family visits;
2. Whether there was any discussion of the case;
3. Whether the family member furnished the juror with any writing that may have contained any information about the case.
The record shows that the judge did individually interrogate the jurors following the weekend visits in compliance with this rule.
The second alleged violation occurred when a juror was allowed to fraternize with individuals in the courthouse during recess:
Ms. Thomas: Mr. Tromblay. While we were all outside during a break, I noticed that Mr. Sylvester was babying a baby and I don't who [sic] that unscheduled happy visitorwhat the deal was.
The Court: I'm going to find out about that right now. Where is the deputy in charge?
The Bailiff: The what?
The Court: The deputy in charge of the jury.
The Bailiff: We got about half a dozen of them.
The Court: I'll take however many they've got.
(Deputies brought to the bench.)

*771 The Court: During the last break Ms. Thomas says Mr. Sylvester was holding a baby. Was he doing that?
Deputy: I didn't see. I let them out.
The Bailiff: He was talking to me outside.
The Court: Let meMr. Sylvester, would you come up a second, sir.
Mr. Sylvester: [sic] During the last break, did you at any time hold a baby outside?
Mr. Sylvester: Yes, sir.
The Court: Who was that?
Mr. Sylvester: I don't know.
The Court: You don't know who it was? Just a little baby?
Mr. Sylvester: That was just a little baby. I had no idea
The Court: Go sit down. Come on back up here. (Summoning the attorneys.) That was just a baby and he didn't have any idea whose baby it was.
Mr. Frederick: We can assume he didn't discuss it with him?
The Court: With the baby, if he did
Ms. Thomas: That's a cute baby.
Mr. Tromblay: We're satisfied that there's no problem.
Mr. Frederick: Thank you, Judge.
The next witness was then called.
The third alleged violation occurred when Roma Eslick was present in the courtroom during the arguments that occurred immediately prior to the penalty phase; although Ms. Eslick heard the attorneys argue, she did not hear any witnesses testify.[5] The court declined to exclude her from testifying, noting "[t]he rule of sequestration deals with testimony of witnesses, not discussions by the Court and counsel."
Louisiana Code of Criminal Procedure article 791(B) provides "[i]n capital cases, after each juror is sworn in he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered." The 1995 revisions to this article changed the former mandatory sequestration requirement; sequestration is now permissive.[6]
Even under the former mandatory sequestration requirement, we have declined to reverse convictions when the alleged sequestration violation is de minimis and there is no prejudice to the defendant. We refused to reverse the defendant's conviction in State v. Liner, 397 So.2d 506 (La.1981) because six sworn jurors were allowed to fraternize with five potential jurors during a fifteen minute recess, as the defendant was not prejudiced by this "technical violation" of sequestration. Logically, the same result has been reached with the permissive sequestration provisions of revised La.C.Cr.P. art. 791(B). In State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, we declined to reverse the defendant's conviction based on an alleged sequestration violation that occurred when one juror's husband called her to complain "about the kids not being used to him." Robertson, 712 So.2d at 23. There was no indication that the juror had discussed the case with her spouse, nor did the record reveal any prejudice resulting from the phone call.
In the present case, we find that the alleged violations of sequestration involving Mr. Sylvester and the family visits do not warrant reversal. The incident involving Mr. Sylvester was minimal, and the defendant does not allege, nor can we discern, how this incident could have prejudiced him. Indeed, as is evidenced by the *772 record excerpt above, trial counsel for defendant seemed satisfied that the incident was non-prejudicial. Similarly, no prejudice resulted from the family visits. The record reveals that deputies were always present during the visits, and, when individually questioned by the trial court, the jurors affirmatively stated that they did not engage in forbidden communications with their visitors. Thus, no prejudice resulted to the defendant from these visits, and these assignments of error lack merit.
Louisiana Code of Evidence 615(A), which governs witness sequestration, provides:
On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.
The rule of witness sequestration is intended "to prevent witnesses from being influenced by the testimony of earlier witnesses" and "to strengthen the role of cross-examination in developing the facts." State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276; State v. Mullins, 353 So.2d 243 (La.1977). As noted by the trial judge, the rule does not pertain to discussions between the judge and attorneys. Ms. Eslick heard only these discussions; she did not hear any witness testimony. Further, defendant does not allege, and our examination of the record does not reveal, any prejudice as a result of Ms. Eslick's presence during the arguments. Thus, both because Ms. Eslick did not hear the testimony of any other witnesses and because there was no prejudice to defendant as a result of this incident, this assignment of error lacks merit.

Unrecorded bench conferences/ defendant's assignment of error number 26
In this assignment of error, defendant contends the absence from the record of transcripts from four bench conferences denied him effective appellate review. He urges this Court to remand the case "to determine whether or not the Bench action can be reconstructed by stipulation of the Judge, the District Attorney, and the Defense."
The first unrecorded conference occurred during the direct examination of Roma Eslick. The defense attorney requested permission to approach the bench while the State was questioning Ms. Eslick about the events that preceded the kidnaping. The attorneys then approached the bench. Afterwards, the State continued the same line of questioning, and there was no objection by the defense.
The second unrecorded conference occurred in between the testimony of Ms. Eslick and the victim's father, who gave victim impact testimony. Defense counsel requested permission to approach the bench immediately before the testimony began. The attorneys then approached the bench, and the victim impact testimony began immediately afterwards, with no objection from the defense.
The third unrecorded bench conference occurred during the testimony of the victim's father. The defense counsel requested permission to approach the bench immediately after the State asked the witness about the victim's relationship with his family. The attorneys approached the bench, and the State asked the same question again immediately after the conference, with no objection from the defense.
The fourth and final unrecorded conference occurred during the testimony of Dr. Seiden. Immediately after Dr. Seiden testified about the arrests for assault that are the subject of the defendant's assignment of error number 14, which was argued and is discussed earlier in this opinion, the defense requested permission to approach the bench. The attorneys approached the bench, and the defense moved for a mistrial out of the hearing of the court reporter. *773 The court then denied the request for a mistrial.
"A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause us to reverse defendant's conviction." State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713, quoting State v. Ford, 338 So.2d 107, 110 (La.1976). Indeed, an incomplete record may nonetheless be adequate for appellate review. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473. Finally, a defendant is not entitled to relief in this situation absent a showing of prejudice based on the missing portions of the transcripts. Id.
Following the first three unrecorded bench conferences, the State's questioning of the witnesses continued in the same vein as it had been prior to the bench conference, and there is no indication that any of this evidence should have been ruled inadmissible. Moreover, defendant does not allege, and the record does not disclose, how he was prejudiced by the absence of these bench conferences from the transcript.
With regards to the fourth unrecorded bench conference, the motion for mistrial that was apparently made during that conference is the subject of defendant's assignment of error number 14. The basis for this assignment of error is easily ascertainable from the record, and the unrecorded bench conference was unnecessary to the discussion of that assignment of error. The defendant suffered no prejudice from the failure of this bench conference to be transcribed.
Accordingly, these assignments of error lack merit.

Sentence Review
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the district judge has submitted a Uniform Capital Sentence Report and the Department of Corrections has submitted a Capital Sentence Investigation Report. In addition, both defendant and the State have filed sentence review memoranda.
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate defendant is a white male born on July 3, 1952. He was approximately 43 years old at the time of the offense. Defendant was first married in 1969 and divorced in 1979. Four children (two boys and two girls) were born of this marriage; these children are all adults. Defendant's first wife died in 1988 or 1989. Defendant married for the second time in 1980 and was divorced in 1995. At the time of trial, there were outstanding warrants out for defendant for kidnaping and rape involving offenses committed against his second wife.
Defendant has two half brothers, one older full brother, and three younger half sisters. His parents were divorced when he was young and he claims that he did not really know his father. Both of defendant's parents are deceased. His father died when defendant was a small child and his mother died in 1980. Defendant grew up in Montgomery County, Alabama and resided there until he was about 20 years old. Between the early 1970s and 1990s, defendant resided between Montgomery County, Alabama and Houston, Texas and earned a living as a truck driver. For approximately five years prior to his arrest, defendant lived in Kansas City, Missouri.
The Capital Sentence Investigation Report noted that no official record of any juvenile adjudications was located but that *774 defendant indicated he went to a reform school in Montgomery at age 13 for grand larceny and was discharged after nine months. He has an extensive adult criminal record, including convictions for burglary, DUI, sexual misconduct, and embezzlement.
While the trial court's Capital Sentencing Report indicates that defendant's intelligence level was never ascertained, the state's expert testified during the penalty phase that his IQ measured at 86, which is low average. The Capital Sentence Investigation Report also reveals defendant indicated he dropped out of school in 7th grade and that in 1967 or 1968, he commenced home study to obtain his GED but never took the test for certification.

Passion, prejudice, and other arbitrary factors
The record does not provide any indicia of passion, prejudice, or arbitrariness. The Capital Sentencing Report reveals that defendant, a caucasian male, killed the caucasian male victim and received a sentence of death from a jury that contained members of his race. The Report also states that little pre-trial media coverage was given to the case. Despite defendant's argument that "there was no way to know whether any members of the jury were homosexuals," nothing suggests that the victim's sexual orientation played any role in the jury's sentencing determination.

Aggravating circumstances
The State presented more than sufficient evidence to demonstrate the aggravating circumstance that defendant was engaged in the perpetration of an armed robbery, aggravated or second degree kidnaping, and/or aggravated burglary. See State v. Arnold, 548 So.2d 920 (La.1989) (seizure and transportation of a person from one place to another for purposes of facilitating the commission of another offense constitutes aggravated kidnaping). The state also presented sufficient evidence to prove that the crime was committed in an especially heinous, cruel, or atrocious manner, given that defendant forced the victim to look at him before beating him about the head with an iron skillet with such force that the skillet broke and then, finding the victim still alive, smothered him to death, all while the victim was bound and gagged. Cf. State v. Rault, 445 So.2d 1203 (La.1984) (heinous, atrocious, or cruel aggravating circumstance proven when victim was raped, strangled, stabbed in the neck and shot twice); State v. Flowers, 441 So.2d 707 (La.1983) (heinous, atrocious, or cruel circumstance found when 70 year old widow was severely beaten, raped, and strangled in her home); State v. Willie, 436 So.2d 553 (La.1983) (heinous, atrocious, or cruel aggravating circumstance proven when victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed).
At any rate, the failure of one aggravating circumstance does not require setting aside a capital sentence resting upon other properly found aggravating circumstances unless the evidence introduced to support the failed circumstance interjected an arbitrary factor into the proceedings. State v. Connolly, 96-1680 pp. 17-18 (La.7/1/97), 700 So.2d 810, 822; State v. Welcome, 458 So.2d 1235, 1245 (La.1983). In this case, the evidence presented by the State during the guilt stage had already fully informed the jury of the circumstances surrounding the victim's death. Thus, reintroduction of the evidence at the penalty phase did not interject an arbitrary factor into the proceedings. See La. C.Cr.P. art. 905.2(A) ("The jury may consider [at sentencing] any evidence offered at the trial on the issue of guilt.")

Proportionality
The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, *775 561 So.2d 692 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987), though this Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1,9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-710 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate). This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
Jurors in the 27th Judicial District, composed of St. Landry Parish, have recommended imposition of the death penalty on three other occasions.
In the first case, State v. Carmouche, 508 So.2d 792, 793-4 (La.1987) (on reh'g), the defendant, a 19 year old black male, was convinced of the first degree murder of an 81 year old white widow. The jury recommended a death sentence upon finding two aggravating circumstances: 1) the offender was engaged in the perpetration or attempted perpetration of aggravated rape/aggravated robbery/ aggravated burglary; and 2) the offense was committed in an especially heinous, atrocious, or cruel manner. Carmouche, 508 So.2d at 801. The defendant appealed his case to this Court, which concluded that the death sentence was not disproportionate; however, on rehearing, the defendant's conviction and sentence were reversed and the case was remanded for a new trial. The defendant then pled guilty to first degree murder and received a life sentence.
In the second case, State v. Bates, 495 So.2d 1262, 1264-66 (La.1986), the defendant, a white male, shot and killed a 20 year old white male hitchhiker whom he had picked up. The defendant was convicted of first-degree murder and the jury recommended death, finding: 1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery or simple robbery; and 2) the offense was committed in an especially heinous, atrocious, or cruel manner. Id. at 1263. Defendant filed a post-conviction relief application alleging conflict of interest between defense counsel and the district attorney. See State ex rel Bates v. Pavy, 481 So.2d 1326 (La.1986). The application was granted and a hearing held at which time an agreement was reached by all attorneys of record. The sentence of death was set aside and the defendant was resentenced to life imprisonment. Id.
In the third case, State v. Lavalais, 95-0320 (La.11/25/96), 685 So.2d 1048, 1060, the defendant, a black male, shot and killed his employer's wife. After convicting the defendant of first degree murder, the jury recommended a death sentence, finding: 1) the offender had been offered or received something of value for the commission of the offense; and 2) the offense was committed in an especially heinous, atrocious, or cruel manner. This Court upheld the sentence of death despite the fact that the individual who hired defendant to commit the murder received a sentence of life imprisonment. Id., 685 So.2d at 1059-60.
A review of these three other capital verdicts from St. Landry Parish does not suggest that defendant received a disproportionately harsh sentence.
Further, a state-wide review of factually similar cases also does not suggest that defendant's sentence is disproportionately harsh. In State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, we upheld the conviction and death sentence of a 17 year old who had kidnaped the victim while stealing his truck and then drove the victim to a secluded area and shot him three times in the head. In State v. Moore, 432 So.2d 209 (La.1983), we upheld the conviction *776 and death sentence of a defendant who had kidnaped, robbed, and shot to death a convenience store manager.

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.R.S. 15:567, until either: (1) defendant fails to petition the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari and either (a) defendant, having filed for and been denied certiorari fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing.
NOTES
[*] Calogero, Chief Justice, not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] Indeed, defendant's attorney admitted during oral argument that, to the best of her knowledge, the defendant still had not had surgery at the time of argument, one and one-half years after the hearing on the motion for continuance. This fact seriously calls into doubt defendant's claims as to the necessity for the surgery.
[3] The statute reads, in pertinent part:

B. Limited Applicability. Except as otherwise provided by Article 1101(A)(2) and other legislation, in the following proceedings, the principles underlying this Code shall serve as guides to the admissibility of evidence. The specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding. (8) Hearings on motions and other summary proceedings involving questions of fact not dispositive of or central to the disposition of the case on the merits, or to the dismissal of the case, excluding in criminal cases hearings on motions to suppress evidence and hearings to determine mental capacity to proceed.
[4] James Nutt also testified against defendant pursuant to a plea agreement, and the existence of this agreement was also made known to the jury. Nutt's testimony, however, was minor compared to that of B.J. Castleberry.
[5] Defendant's assignments of error include these three errors, which he asserts are sufficient to reverse the conviction, and a general allegation that "[t]he trial court committed error sufficient to vacate and set aside the penalty phase when it allowed violations of Sequestration." This explains why only three alleged violations are listed for defendant's four errors.
[6] Paragraph B of this article had formerly read:

In capital cases, after each juror is sworn he shall be sequestered.