PEATROSS, J.
 

 | defendants, Glen Dale Nelson and Melvin Goldman, were convicted by a jury of one count of illegal use of weapons, four counts of armed robbery and one count of conspiracy to commit armed robbery. The trial judge sentenced both Defendants to serve 3 years’ imprisonment at hard labor for illegal use of weapons, 80 years’ imprisonment at hard labor without parole for three of the four counts of armed robbery, 99 years’ imprisonment at hard labor without parole for the fourth count of armed robbery and 49½ years’ imprisonment at hard labor without parole for conspiracy.
 
 *645
 
 Nelson and Goldman now appeal; Nelson urges one assignment of error, and Goldman urges three assignments. For the reasons explained herein, both Defendants’ convictions and sentences are affirmed.
 

 FACTS
 

 This case concerns a 2007 armed robbery at a high-stakes poker game at a mobile home in Monroe, Louisiana. On December 2, 2007, a group of three armed masked men entered the home and robbed four people; one person was shot during the robbery. The robbers escaped, but police quickly developed suspects. Subsequently, two of those suspects, one of whom was one of the masked robbers and one who was an “inside man,” identified Defendants Glen Dale Nelson and Melvin Goldman as the other two masked robbers. The following evidence was developed at Nelson and Goldman’s joint jury trial.
 

 In 2007, Ms. Sheila Newell routinely hosted “high-stakes” card games at her home on Gordon Avenue in Monroe. The gamblers sometimes won or lost several thousand dollars during the course of the game. On |2Sunday, December 2, 2007, about 15 people were at Ms. Newell’s home. Several men were participating in the afternoon’s card game; among the participants were DeMichael Hampton, Dan Ross, Jerry Martin and James “Poochie” McGraw, the half-brother of Defendant Nelson.
 

 That afternoon during the game, Nelson came to Ms. Newell’s house and stayed for about 20 minutes to watch some of the card game. Ms. Newell said that Nelson was visiting McGraw. Hampton said that Nelson was also visiting Ms. Sandtrovia “Toby” Wright, the girlfriend of Malvin “White” Goldman, the brother of Defendant Goldman. Hampton said that he saw that Nelson was arguing with Ms. Wright and that Nelson was armed with a gun.
 

 McGraw stayed in the card game after his brother left, but he continued to lose until he had no money left with which to gamble. McGraw remained at Ms. New-ell’s house after he lost all his money, but did not attempt to keep playing. The others described this as unusual behavior for him, because McGraw usually asked others for more money to continue playing on occasions when he had lost his original stake.
 

 Later that evening, Ms. Newell noticed that McGraw used his cell phone to call someone while the three other men continued to play cards with Ms. Newell. Subsequently, three armed men entered Ms. Newell’s home through the front door. The men wore stockings or masks over their heads, but Ms. Newell was able to see through one robber’s stocking mask and recognized that man as Nelson. Nelson, armed with a handgun, approached Ms. Newell and demanded money while reaching into |aMs. Newell’s brassiere where she usually kept her winnings. That day, Ms. Newell had hidden her money (about $900) in her sock instead of her brassiere, so she retrieved it from there and surrendered the money to Nelson.
 

 Searching for more money, the robbers made Hampton take off his clothes, and one of the men took $500 and a necklace valued at $850 that Hampton had tried to hide on the floor. Hampton was able to hide his wallet, containing about $4,000, before the robbers searched him. At trial, for the first time, Hampton identified Nelson as one of the robbers. The men took $500, a watch and a ring from Ross and took $50 from Martin. During the robbery, one of the robbers referred to McGraw by his nickname when he said “Poochie, where the money at?”
 

 Ms. Wright was in the bathroom during much of the robbery; when she came out
 
 *646
 
 of the bathroom, one of the robbers shot her in the leg. After the shooting, the robbers fled, warning the victims not to follow. The victims waited a short while and then one of Ms. Wright’s friends took her to the hospital; her wounds were not life-threatening.
 

 After some discussion about whether or not to call the police,
 
 [1]
 
 Ms. Newell decided to report the robbery. In the meantime, McGraw left Ms. Newell’s home, stating that he was going home to get his gun; however, Ms. Newell noticed that McGraw traveled in a direction away from his home. Shortly thereafter, McGraw later returned to Ms. Newell’s home. Ms. New-ell became suspicious of McGraw; and, after police arrived, she 14did not make a detailed statement to the police. She elected to wait and make a statement at the police station rather than speak in front of the crowd at her home. McGraw did not speak with the police at the crime scene.
 

 Monroe Police Detective James Willis was one of the officers who responded to the call. He spoke to Ms. Newell first and noted that she was very nervous, so he made a plan to meet with her the next day. At that meeting, Ms. Newell told the detective that she recognized Nelson as one of the robbers.
 

 The police arrested Nelson and McGraw together on December 11, 2007. From the beginning, McGraw expressed a desire to tell police what had happened if the State would promise him leniency, but the State did not do so until approximately a year later. In December 2008, McGraw pled guilty to conspiracy to commit armed robbery with a recommendation for a five-year sentence and no habitual offender bill; the sentence recommendation was conditioned on McGraw’s truthful testimony at this trial.
 

 In the course of his guilty plea, McGraw named Goldman and Keith Blakes as the other two robbers. Police arrested Blakes; and, before he had an agreement with the State, Blakes immediately confessed and identified the other participants in the robbery, including Nelson and Goldman. Police subsequently arrested Goldman.
 

 Ultimately, Nelson and Goldman were charged together in the same bill of information. Goldman filed a motion to sever the charges wherein he asserted that the joint bill prejudiced him because Goldman was only [ 5implicated in the case due to the testimony of McGraw and Blakes. The trial judge heard argument on the motion and found no justification to sever the matters. In particular, the judge found that the defenses made by Defendants were not antagonistic and that both Defendants were accused of exactly the same crimes. Goldman reiterated the motion during the trial in argument about an alleged
 
 Batson
 
 violation by Defendants, but the judge denied the motion again.
 

 At trial, McGraw testified that his half-brother, Nelson, had several times discussed “hitting a lick,” or robbing the card game, and that the plan was finally executed after McGraw had lost all his money in the game. McGraw explained that he discussed the robbery with Nelson during them visit at Ms. Newell’s house earlier on the day of the robbery, and they decided that McGraw would call Nelson and tell Nelson when to come over for the robbery.
 

 McGraw testified that, after he called Nelson, Nelson arrived at Ms. Newell’s home with two other masked persons, whom McGraw identified as Goldman and
 
 *647
 
 Blakes. McGraw said that Nelson searched Ms. Newell and Hampton, and he said that he saw that Nelson and Goldman were armed. McGraw related that he recognized Goldman, an acquaintance, as one of the robbers both by hearing his voice and by seeing the area around Goldman’s eyes where his face was not covered by the mask.
 

 Like McGraw, Blakes entered into an agreement with the State in exchange for his testimony. Blakes pled guilty to a reduced charge and agreed to testify truthfully at the trial in exchange for a five-year sentence | ¡¡recommendation and no habitual offender bill. Blakes, who knew Nelson, said that he was at the nearby Parkview Apartments playing cards with Nelson and Goldman just prior to the robbery. He described Nelson’s SUV, which was later confirmed by other witnesses to be Nelson’s vehicle, as the vehicle used to transport the men to and from the robbery. Blakes said that the three of them planned to hit a lick, or commit a robbery, although Blakes was unclear about who would be robbed. He said that Nelson had a gun, that he was unsure whether Goldman had a gun, and that he (Blakes) did not have a gun, but pretended to have one. He said that no one was supposed to get shot and that, after the shooting, the robbers fled back to the apartment where they had been prior to the robbery.
 

 After the State rested its case, Nelson called his nephew, Donte Brown, as an alibi witness. Brown testified that, on the day of the robbery, he was with Nelson and Goldman at the Parkview Apartments from about 5:00 or 6:00 p.m. until about 9:00 p.m. Brown said that the men did not leave the apartment during this time. On cross-examination, Brown admitted that, since February 2008, he had been housed with Nelson in the same section of the same correctional facility and that he had seen his uncle there every day. Brown also had prior convictions for contempt of court and obstruction of justice.
 

 Nelson also called Ms. Henrietta McGraw, Nelson and McGraw’s mother, as a witness. She testified that McGraw told her that “we” (meaning he and Nelson) didn’t have anything to do with the robbery, and that he (meaning McGraw) had been the victim of the robbery. |7Ms. McGraw further testified that she spoke with McGraw again after he pled guilty, and McGraw told her that he had pled guilty “so I could see my children.”
 

 Goldman called his girlfriend, Ms. Yolanda Norman, as an alibi witness. Ms. Norman testified that she, Goldman and Nelson were all together at her apartment at the Parkview Apartments on the day of the robbery in “the daytime, after lunchtime, after 12:00.” She explained that Goldman was at her apartment all day barbecuing and playing cards. The State confronted Ms. Norman with her grand jury testimony wherein she did not name Goldman as one of the people at her apartment on that day; Ms. Norman, however, claimed that the transcript of the grand jury testimony was inaccurate.
 

 On rebuttal, the State called the court reporter who transcribed the grand jury testimony. Through the reporter, the State offered the tape of Ms. Norman’s testimony into evidence. The tape was admitted and played for the jury. In the earlier proceeding, Ms. Norman was asked who else, besides herself and Nelson, was at her apartment on the day of the robbery. She named several people, but did not include Goldman. Detective Willis then testified that no alibi witnesses came forward after Defendants were arrested.
 

 After hearing the evidence, the jury deliberated for less than an hour and returned verdicts of guilty on all counts as to
 
 *648
 
 both Defendants. Subsequently, counsel for both Defendants filed a motion for new trial, and both Defendants,
 
 pro se,
 
 filed their own motions for new trial. All of the | ^motions complained of errors in the jury selection and the judge denied all of the motions.
 

 During sentencing, the judge examined both Defendants’ criminal and social histories as reflected in the presentence investigations. Both men had an unusually long and violence-prone criminal histories, and the judge concluded that their sentences should be the same, to wit:
 

 —• Illegal use of a dangerous weapon: Three years’ imprisonment at hard labor.
 

 — Armed robbery (three counts, unspecified victims): eighty years’ imprisonment at hard labor without parole.
 

 — Armed robbery (one count, unspecified victim): ninety-nine years’ imprisonment at hard labor without parole.
 

 — Conspiracy to commit armed robbery: fifty years’ imprisonment at hard labor without parole.
 

 The judge imposed these sentences concurrently. Defendants filed motions to reconsider sentence, which the judge denied. Shortly thereafter, the judge vacated the sentences for conspiracy as illegal and re-sentenced both men to serve 49½ years’ imprisonment at hard labor without parole. Both men now appeal their convictions and sentences.
 

 DISCUSSION
 

 Assignment of Error 1 (Goldman):
 
 The trial court erred as the evidence presented at trial, when viewed in a light most favorable to the prosecution, was insufficient to sustain Melvin Goldman’s convictions.
 

 Goldman argues that the State’s proof that he was one of the masked robbers is insufficient. When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for | previewing sufficiency first is that the accused may be entitled to an acquittal under
 
 Hudson v. Louisiana,
 
 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt.
 
 State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Bosley,
 
 29,-253 (La.App.2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La.10/17/97), 701 So.2d 1333.
 

 The
 
 Jackson
 
 standard does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 05-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833,
 
 writ denied,
 
 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La. App.2d Cir.2/25/09), 3 So.3d 685,
 
 writ denied,
 
 09-0725 (La.12/11/09), 23 So.3d 913;
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient
 
 *649
 
 support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 06-1083 (La.11/9/06), 941 So.2d 35.
 

 In cases involving a defendant’s claim that he was not the person who committed the crime, the
 
 Jackson
 
 rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof.
 
 State v. Hughes,
 
 05-0992 (La.11/29/06), 943 So.2d 1047;
 
 State v. Powell,
 
 27,959 (La. App.2d Cir.4/12/96), 677 So.2d 1008,
 
 writ denied,
 
 96-1807 (La.2/21/97), 688 So.2d 520.
 

 Louisiana law allows an accomplice to testify against a co-perpetrator even if the state offers inducements to testify. Such inducements are a factual consideration in evaluating the witness’s credibility.
 
 State v. Hughes,
 
 05-0992 (La.11/29/06), 943 So.2d 1047;
 
 State v. Neal,
 
 00-0674 (La.6/29/01), 796 So.2d 649,
 
 cert. denied,
 
 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). A conviction may be sustained by the uncorroborated testimony of an accomplice, although the jury should be instructed to treat the testimony with caution.
 
 State v. Hughes, supra; State v. Tate,
 
 01-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). When the accomplice’s testimony is materially corroborated by other evidence, such language is not required. Id.;
 
 State v. Castleberry,
 
 98-1388 (La.4/13/99), 758 So.2d 749,
 
 cert. denied,
 
 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). An accomplice’s testimony is materially corroborated “if there is evidence that confirms material points in an accomplice’s tale, and confirms the |n defendant’s identity and some relationship to the situation.”
 
 State v. Castleberry, supra.
 

 In the case
 
 sub judice,
 
 the eyewitnesses who identified Goldman as one of the masked robbers were McGraw and Blakes. Both of these men — Goldman’s accomplices — pled guilty to reduced charges and received a five-year hard labor sentence in exchange for their testimony against Nelson and Goldman. The jury was made well aware of the circumstances of the plea agreements connected to the testimony of these witnesses. Their testimony was consistent in all salient points with the testimony of the other eyewitnesses to the robbery itself, and both men inculpated Nelson along with Goldman as parties to the robbery. The jury heard Ms. Newell identify Nelson as one of the robbers — she recognized Nelson’s face under his mask- — and that testimony is consistent with that of both McGraw and Blakes as to Nelson’s identity as one of the masked robbers. Likewise, the witnesses reported that McGraw was behaving unusually and used his cell phone prior to the robbery; McGraw admitted that he used the phone to call Nelson and tell him to rob the others.
 

 Blakes, who confessed to police prior to being offered any advantage for his testimony, told the jury that he, Nelson and Goldman were all together at the Parkview Apartments just prior to the robbery and returned there afterwards and the jury was free to accept that all the masked defendants were together near the crime scene shortly before the crime. Indeed, Goldman offered evidence that he was at the nearby Parkview Apartment complex on the date of the robbery. Although witnesses for the |12defense denied that either Nelson or Goldman left the apartment, the jury was free to reject that testimony as lacking credibility given the concerns raised by the State on cross-examination of the alibi witnesses.
 

 
 *650
 
 In the jury instructions, the judge informed the jury that it was the sole judge of the credibility of the witnesses and may consider any interest the witness may have in the case, whether the "witness has any other reasons or motive for not telling the truth and any other circumstances surrounding the giving of testimony which may aid the jury in weighing the statements. In addition to the accomplices’ testimony, the jury heard evidence that Nelson and Goldman were together near the scene of the crime at the time the robbery occurred and that Nelson had been identified as one of the masked robbers by one of the victims. There is nothing in the record to justify an intrusion on the jury’s decision to credit the accomplices’ testimony that Goldman was one of the perpetrators, so the evidence is sufficient to prove Goldman’s identity — and, thus, his guilt — beyond a reasonable doubt.
 

 This assignment of error is without merit.
 

 Assignment of Error 1 (Nelson):
 
 The trial court erred by refusing to grant peremptory challenges to the defense as a result of a reverse
 
 Batson
 
 challenge by the state.
 

 Assignment of Error 2 (Goldman):
 
 The trial court erred in ruling that defendants had committed a
 
 Batson
 
 violation and in the remedy it imposed.
 

 Both Defendants complain on appeal that the trial judge mishandled jury selection; and, in particular, they argue that the judge erred in handling |)Sa so-called “reverse
 
 Batson
 
 ” challenge by the State.
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
 
 [2]
 

 Three panels of 16 potential jurors, for a total of 48 potential jurors, were summoned and questioned in this case. Of these 48 jurors, 33 were Caucasian and 15 were African-American. Defendants and the victims in this case were all African-American. The judge allowed Defendants to confer before exercising their peremptory challenges to give them, collectively, 24 peremptory challenges. Goldman used 8 peremptory challenges to excuse Caucasian jurors and 1 to excuse an African-American juror; Nelson used 9 peremptory challenges, all against Caucasian jurors.
 

 At that point, after 8 jurors (4 African-American and 4 Caucasian) had been chosen, the district attorney challenged Defendants’ use of peremptory challenges on the grounds that the challenges were racially motivated.
 
 [3]
 
 The district attorney noted that the racial makeup of the community, based on voter registration only, was roughly 32% African-American and that nearly all of the remaining population was Caucasian.
 

 The trial judge stated that he believed that the State had made a
 
 prima facie
 
 case of racial discrimination by Defendants and then the judge asked the Defendants to provide race-neutral reasons for their challenges. After hearing all of the proffered reasons for the excuses, the judge reiterated that he found that the State had made out a
 
 prima facie
 
 case of racial discrimination in the exercise of peremptory challenges by both 114Pefendants. The judge then engaged the attorneys in a thoughtful discussion of how best to analyze their strikes given that Defendants collaborated, but that each Defendant did not necessarily agree on every strike exercised by the other. The judge stated that he did not believe that Defendants conspired to violate the rule of
 
 Batson,
 
 but finally concluded that Defendants had en
 
 *651
 
 gaged in racial discrimination in the exercise of their peremptory challenges.
 

 The judge then discussed the range of remedies for the violation. The judge observed that the parties had accepted four Caucasian jurors and four African-American jurors already, so only four jurors remained to be chosen. The judge stated:
 

 The state has made out its
 
 prima facie
 
 case. I find the race neutral explanations offered by both defendants convincing as to one or more of the individual jurors, but the overall pattern and the vagueness of some of the reasons convinces me that [a]
 
 Batson
 
 violation has occurred. The sheer numerical analysis not only makes out a
 
 prima facie
 
 case, but a compelling case. And the race neutral explanations offered do nothing to — do very little to push back on that compelling case.
 

 The judge elected to try to contact those jurors whom Defendants had improperly excused and reseat them, if possible. After careful consideration, and after specifically considering each proffered explanation, the judge accepted eight of Defendants’ explanations. The judge rejected nine explanations, however, finding purposeful discrimination, and ordered these jurors reseated: Tonya Harper Smith, Angela Maher, Angela D’Angelo, Sandra Clower, Pamela Auttonberry, Brandi Cruse and Kyle Nordman. In addition to these seven jurors, the judge rejected Defendants’ | ^proffered reasons as to jurors Lucky Reed and Sandra Sib-ley and would have ordered them reseated; however, Sibley was out of state and Reed could not be located.
 

 To clarify the record, Defendants revisited their reasons for the peremptory challenges of the reseated jurors. The judge reiterated his rulings reseating the jurors, and Defendants objected to those rulings. The judge then forbade either Defendant from peremptorily challenging any of the reseated jurors, regardless of who exercised the challenge initially, although the judge otherwise allowed each Defendant his remaining three peremptory challenges.
 

 Although there is no objection by either Defendant in the record to this procedure at the exact time the judge made this ruling explicit, Defendants had earlier objected repeatedly and vociferously to any limitation of their right to exercise peremptory challenges, thus preserving the issue for appellate review. Further, Defendants sought emergency supervisory relief from this court on the jury selection issues; this court denied their applications on the showing made. Ultimately, a 12-person jury was seated and 3 alternates were chosen.
 
 [4]
 
 Defendants objected to the seating of the jury based on the judge’s handling of the
 
 Batson
 
 objection. Juror Angela Maher was subsequently challenged for cause and excused after reporting that she had read a newspaper story about this offense after she had originally been excused.
 

 | ^Defendants urge on appeal that the trial judge erred in finding that their exercise of peremptory challenges violated
 
 Bat-son,
 
 in reseating the various jurors and by limiting their peremptory challenges thereafter.
 

 La. Const. Art. 1, § 17 provides, in part:
 

 The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptori
 
 *652
 
 ly. The number of challenges shall be fixed by law.
 

 La. C. Cr. P. art. 795 provides, in part:
 

 C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
 

 D. The court shall allow to stand each peremptory challenge exercised for a race or gender neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.
 

 E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral or gender neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral or gender neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.
 

 The combination of factors needed to establish a
 
 prima facie
 
 case is: (1) the objecting party must demonstrate that the challenge was directed at a member of a cognizable group; (2) the objecting party must then show the |17challenge was peremptory rather than for cause; and (3) finally, the objecting party must show circumstances sufficient to raise an inference that the challenging party struck the veni-re person on account of being a member of that cognizable group.
 
 State v. Givens,
 
 99-3518 (La.1/17/01), 776 So.2d 443.
 

 The Louisiana Supreme Court explained the law and analysis in the context of an alleged
 
 Batson
 
 violation by the state in
 
 State v. Elie,
 
 05-1569 (La.7/10/06), 936 So.2d 791:
 

 The Supreme Court in
 
 Batson
 
 held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person’s race. See also La.Code Crim. Proc. Ann. art. 795.... If the defendant makes a
 
 prima facie
 
 showing of discriminatory strikes, the burden shifts to the State to offer racially-neutral explanations for the challenged members. The neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar.
 
 State v. Collier,
 
 553 So.2d 815, 820 (La. 1989). If the race-neutral explanation is tendered, the trial court must decide, in step three of the
 
 Batson
 
 analysis, whether the defendant has proven purposeful discrimination.
 
 Purkett v. Elem,
 
 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)
 
 (per curiam).
 
 A reviewing court owes the district judge’s evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous.
 
 Hernandez v. New York,
 
 500 U.S. 352, 364, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991);
 
 Batson,
 
 476 U.S. at 98, n. 21, 106 S.Ct. at 1724.
 

 
 *653
 
 The
 
 Batson
 
 explanation does not need to be persuasive, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral.
 
 Purkett,
 
 514 U.S. at 767, 115 S.Ct. at 1771.
 

 The
 
 Hernandez
 
 court explained:
 

 A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a | ^discriminatory intent is inherent in the [party’s] explanation, the reason offered will be deemed race neutral.
 

 Hernandez,
 
 500 U.S. at 359, 111 S.Ct. at 1866. The ultimate burden of persuasion remains on the party raising the challenge to prove purposeful discrimination.
 
 Purkett,
 
 514 U.S. at 767-68,115 S.Ct. at 1771;
 
 Hernandez,
 
 500 U.S. at 359, 111 S.Ct. at 1866.
 

 The court in
 
 Elie
 
 also discussed three recent cases from the United States Supreme Court:
 
 Johnson v. California,
 
 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005);
 
 Miller-El v. Dretke,
 
 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005); and
 
 Rice v. Collins,
 
 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). These cases refined the
 
 Batson
 
 analysis in several ways.
 
 Johnson
 
 held “that a moving party need only produce ‘evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.’ ”
 
 Id. Miller-El
 
 emphasized that the determination of discriminatory intent “requires close scrutiny of the challenged strikes when compared with the treatment of panel members who expressed similar views or shared similar circumstances in their backgrounds.”
 
 Elie, supra.
 
 Finally,
 
 Collins
 
 evaluated the federal
 
 habeas
 
 review of a determination in state court that a prosecutor’s proffered justification was race-neutral; the court reiterated:
 

 [As a final step,] the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.
 
 Batson, supra,
 
 at 98, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. This final step involves evaluating “the persuasiveness of the justification” proffered by the prosecutor, but “the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.”
 
 Purkett, supra,
 
 at 768, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834.
 

 | isThe defendant is also prohibited from engaging in racial discrimination in the use of peremptory challenges; this is the so-called
 
 “reverse-Batson”
 
 rule.
 
 Georgia v. McCollum,
 
 505 U.S. 42, 112 S.Ct. 2348,120 L.Ed.2d 33 (1992).
 

 In the instant case, the trial judge’s consideration and analysis of Defendants’ use of peremptory challenges was exhaustively conscientious and thorough. We detect no error in the trial judge’s initial finding that the State had established a
 
 prima facie
 
 case
 
 [5]
 
 of racial discrimination in the use of peremptory challenges; Defendants collectively used 17 out of 18 challenges against Caucasian jurors; and, given the racial makeup of the panels, the trial judge found this “eyebrow raising.” Second, Defendants offered explanations for their peremptory challenges; and, since none of these explanations referred to the race of the jurors, the reasons are facially race-neutral.
 

 
 *654
 
 Both Defendants urge that the trial judge’s decisions in the third step of the
 
 Batson
 
 analysis, the determination of discriminatory intent in the exercise of peremptory challenges, were erroneous. Again, a reviewing court owes the trial court’s evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous.
 
 Elie, supra, citing Hernandez, supra.
 

 The record reveals that the trial judge’s decisions were carefully considered; and, despite an occasional misstatement by the trial judge |2nduring the course of the lengthy argument, the record does not support Defendants’ assertion that the trial judge placed on them the burden of proving a lack of discriminatory intent. The judge read the applicable law aloud in the courtroom and found no discriminatory intent in nearly half of Defendants’ proffered explanations for their challenges and allowed those challenges to stand. For the remaining half, however, the judge found that Defendants’ discriminatory intent outweighed the proffered explanations.
 

 What follows is a description of the proffered reasons for all of the jurors peremptorily challenged by Defendants and the basis in the record for (only) those jurors ordered reseated:
 

 1.Tonya Harper Smith — Reseated.
 

 Nelson challenged Ms. Smith because: “She interacted freely with [the prosecutor] during
 
 voir dire.
 
 I didn’t get very much interaction out of her when I asked her questions. And her answers to me indicated to me basically that she was pro-prosecution when she answered questions.”
 

 He also reported:
 

 “[According to my notes that I didn’t like about it was her discussion of the alibi. She said that, you know, they may lie because they’re family, those types of things. Or they would be — not might, they would probably lie was what I have down here.”
 

 A review of the record does not show that Ms. Smith was asked by the district attorney or by either defense counsel about alibi witnesses, nor does the record show that Ms. Smith’s interactions with the district attorney were different in character from her interactions with counsel for Defendants.
 

 2. Bryan Owens — Not Reseated.
 

 Nelson challenged Mr. Owens because:
 

 12i “I didn’t like the fact that he’d been a justice of the peace.” “[H]e lived in upstate New York, came back.”
 

 3. Brandi Cruse — Not Reseated.
 

 Nelson’s attorney had some difficulty reading his handwritten notes about Ms. Cruse, but recalled that “she wasn’t very interactive with me in terms of eye contact .... Originally, I had her down as questionable.”
 

 4. Allison Rials — Not Reseated.
 

 Nelson excused Ms. Rials because a former in-law was a police officer, and “she was very strong in being okay with plea bargaining in exchange for testimony.”
 

 5. Nicholas Tannehill — Not Reseated.
 

 Nelson excused Mr. Tannehill because he had been the victim of a robbery at gunpoint. He was also “pretty strong” “with the plea bargaining process.”
 

 6. Laura Cooper — Not Reseated.
 

 Nelson excused Ms. Cooper because she was nervous and “I didn’t think she was going to be able to handle it. And her answers were all over the place.”
 

 
 *655
 
 7. Ronnie Marsh — Not Reseated.
 

 Nelson excused Mr. Marsh because of his “connection with Mr. Aycock (the prosecutor) [Mr. Aycock had represented his son-in-law], part of the concern as well as his answers in response to, he said if one witness testified, even though there wasn’t any corroboration, as long as he believed him, that would be enough for him.”
 

 8. Angela Maher — Reseated But Later Excused For Cause.
 

 ^Nelson excused Ms. Maher (as a strike back) because she knew one of the district attorneys, and she said that she believed one of the district attorneys had a camp at Lake Claiborne and Ms. Maher also had a camp there. Ms. Maher said that “we had a camp at Lake Claiborne and [the district attorney’s] wife has worked for my husband at one time.” During discussion with the judge, the district attorney confirmed that he had a camp at the lake, but he did not know Ms. Maher or know that she had a camp at the lake.
 

 In addition, counsel offered that “[Ms. Maher] said if the alibi is a friend or relative, they would automatically take up for the defendant.” Ms. Maher’s statements about alibi witnesses were brief and innocuous; she explained her belief that alibi witnesses could be relatives because “they’re often together. A brother, a sister, mother, father.” Her responses did not indicate any perception of bias by these persons.
 

 9. Angela D’Angelo — Reseated.
 

 Nelson excused Ms. D’Angelo (another strike back) because “she was fairly strong for the prosecution in the sense of being okay with people who flip and she also had the same answer with regard to the alibis.”
 

 When the district attorney asked the jurors whether it was okay for a defendant “to get a little bit better [deal] because he owned up and took responsibility for what he did and he’s testifying?,” Ms. D’Angelo responded, “Yes, it is.” She then expressed understanding and agreement that the decision about criminal sentencing was the judge’s responsibility, but then rejected the district attorney’s hypothetical suggesting that one ^defendant who agreed to testify should get half the sentence of a defendant who insisted on going to trial. Like other jurors, she said that she would consider the testimony of a co-defendant, but would like to see more evidence before convicting, “like alibis, was that person actually there.”
 

 With regard to alibi witnesses, Ms. D’Angelo first said that she believed the district attorney would be the person most likely to call these witnesses, and then she said that she understood the district attorney’s explanation that the defense typically calls alibi witnesses.
 

 10. Edwin Linder — Not Reseated.
 

 Goldman excused Mr. Linder because “he was very agreeable with the one-witness theory, that one witness was enough to convict someone. He was just too agreeable with it. He was totally — -he didn’t seem to consider any background or anything like that was going to be a problem for him.” Further, he had prior jury service where the jury had convicted the defendant.
 

 11. Sandra Clower — Reseated.
 

 Goldman excused Ms. Clower because her “overall demeanor appeared to be very pro-state.” Also:
 

 She was very agreeable with [the prosecutor]. She’d nod her head when things were being said. I was watching her. She was also very agreeable that plea deal witnesses were okay and that didn’t seem to affect any credibility at all.
 

 
 *656
 
 As is commonly the case, the record does not provide a meaningful way to review the juror’s demeanor. The juror agreed that she could listen to a co-defendant witness and that it would be acceptable for her for a testifying co-defendant to get “a little bit” better deal than a defendant who l^went to trial. There is essentially nothing else in the record to measure her opinion about the credibility of a witness who testified pursuant to a plea bargain.
 

 12. Sandra Nelson — Not Reseated.
 

 Goldman excused Ms. Nelson because “she’s the first one that said it was our [defense lawyers] job to lie to people.... And that she seemed to be very negative on defense calling alibi witnesses to prove that the defendant was somewhere else.”
 

 13. Sandra Sibley — Ordered Reseated but Not Available.
 

 Goldman excused Ms. Sibley because “she seemed to be very pro-police. She’s the one that was convinced that nobody was ever arrested without enough evidence and that if the people were sitting here, there must have been enough evidence to arrest them.”
 

 Counsel for Nelson asked Ms. Sibley whether someone who got arrested must have done something wrong, to which she responded: “If they accuse you, you have to have a lot going for you to arrest someone. So, you think that if they’ve gotten to that point, they have some sort of evidence or they wouldn’t have arrested them.” She agreed, however, with counsel that the fact of arrest would not influence her or play any part in her determination once she heard the evidence presented at trial.
 

 Responding to questioning by counsel for Goldman, Ms. Sibley repeated her belief that police must have some sort of evidence before they arrested someone, but that the evidence could be “wrong evidence” and “that’s why it’s up to the state to prove that.” When asked if there was [2fiSome evidence against Defendants because “they’re sitting here,” she responded: “No. But I guess that’s the way it looks, but-” and she was then interrupted by counsel, who told her that there was no right or wrong answer. Ms. Sibley then said:
 

 I know they’re innocent until proven guilty. But I still — I mean, I just still feel that if they’ve been arrested, there is some sort of evidence there.
 

 She continued by explaining that she felt that, if a person was arrested, “there’s something there. I’m not saying they’re guilty of it. And they could have been falsely arrested, and when the state gets up and proves that — but there’s a reason why they’ve been arrested.” She agreed with counsel that the reason for arrest was not necessarily a good reason, said that she “would try my best” to be a fair juror, and that defense counsel should not have any concerns about her fairness.
 

 14.Pamela Auttonberry — Reseated.
 

 Goldman excused Ms. Auttonberry because “she appeared to be very negative about alibi witnesses. She thought friends and family would lie and it would be better to have reputable witnesses to appear [-].”
 

 This juror gave her opinion that friends and family would be the most likely people to be alibi witnesses and answered “sure” when asked if friends or family might have a reason to lie for a defendant. She said that unrelated people or strangers would not have a reason to lie.
 

 |2615. Kyle Nordman — Reseated.
 

 Goldman excused Mr. Nordman because he “appeared to me to be leaning in the direction that the defendants had to prove
 
 *657
 
 something to him that they were innocent.”
 

 Mr. Nordman said that the state “has the uphill battle,” but initially said that the defendant has to prove “that they didn’t do anything wrong.” He then agreed, however, that a defendant has the right to remain silent and that he would not hold it against a defendant if he did not testify. He indicated that the defendant did not have to prove anything, but said “that’s what they pay y’all [defense attorneys] for” and that counsel could prove the defendant innocent with “the witnesses, the circumstances, the evidence.” He finally agreed with defense counsel that the defense did not have to prove the defendants innocent because they were “already innocent.” He also affirmed that he could be a fair juror.
 

 Notably, after his original ruling, the trial judge offered Defendants an opportunity to peremptorily challenge Mr. Nord-man from his service as an alternate and both Defendants declined the opportunity.
 

 16. Mitzy Aeree — Not Reseated.
 

 Goldman excused Ms. Aeree because of a family relationship issue and because of his impression that she did not seem to be paying much attention.
 

 | ¾717. Lucky Reed — Ordered Reseated but Unavailable.
 

 Goldman excused Mr. Reed because “he appeared to be fairly flippant about his answers in terms of his responses to any questions. And I just didn’t deem him serious enough that I wanted him on the jury.”
 

 Again, the record cannot clearly affirm or deny counsel’s assertion that Reed was flippant or not serious; however, the few interactions in the record between the attorneys and Mr. Reed do not contain anything to suggest that he would not be an acceptable juror.
 

 We detect no manifest error in the trial judge’s decisions. Nearly all of the proffered reasons for excusing the reseated jurors had essentially no basis in the record, and the district attorneys ably pointed this out to the trial court, thus satisfying their burden of proof under the third step of the
 
 Batson
 
 analysis. There was a limited basis in the record for the challenges to jurors Sibley, Auttonberry and Nordman (and the judge offered Defendants a second opportunity to peremptorily challenge Nordman), but the excuses for these jurors were thin and the trial judge was within his discretion in finding that the State had proven deliberate race-based exclusion of all of the reseated jurors.
 

 Significantly, there was no reason for the judge to allow Defendants a second opportunity to peremptorily challenge the reseated jurors (apart from Nordman, for whom a second challenge was offered, but rejected) because of the judge’s finding that Defendants had already excluded these jurors primarily because of their race. Since Defendants both chose to excuse jurors based upon the jurors’ race, the trial judge did not err in Ladenying them a second opportunity to justify peremptory challenges to the same jurors even if Defendants could proffer some different, ostensibly race-neutral, reason for the peremptory challenge that the challenging party had not raised. We conclude, therefore, that the trial judge’s refusal to allow either Defendant challenges to the reseated jurors was reasonable and proper under the Louisiana constitution and jurisprudence.
 
 [6]
 

 These assignments of error are without merit.
 

 
 *658
 

 Assignment of Error 3 (Goldman):
 
 The trial court erred in denying Melvin Goldman’s Motion to Sever.
 

 Goldman urges that the trial judge erred in denying his motion to sever. His argument on appeal urges that the joint trial meant that Goldman could not independently exercise peremptory challenges after the judge found a
 
 Batson
 
 violation by both Defendants. Goldman concedes that his and Nelson’s defenses were not antagonistic.
 

 La. C. Cr. P. art. 704 provides:
 

 Jointly indicted defendants shall be tried jointly unless:
 

 (1) The state elects to try them separately; or
 

 (2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
 

 |2;>A ruling on a severance motion will not be reversed on appeal absent a clear showing that the trial court abused its discretion.
 
 State v. Richardson,
 
 33,272 (La. App.2d Cir.11/1/00), 779 So.2d 771,
 
 unit denied,
 
 00-3295 (La.10/26/01), 799 So.2d 1151. After trial has concluded, an abuse of discretion will not be found unless the defendant would probably not have been convicted had he been allowed a separate trial.
 
 State v. McGraw,
 
 366 So.2d 1278 (La.1978).
 

 The trial judge’s decision not to sever Goldman’s prosecution from Nelson’s did not actually prejudice Goldman. The judge allowed Goldman and Nelson to cooperate in their exercise of peremptory challenges so as to give each Defendant twelve challenges. When the two of them together used 17 out of 18 of those challenges to excuse Caucasian jurors and the court found that these jurors were excused because of their race, the court acted to prevent either Defendant from excusing any juror who had already been excluded by the other Defendant for a pretextual reason. This was a reasonable way for the judge to handle this difficult problem so as not to have to revisit the
 
 Batson
 
 analysis that the judge had already exhausted for these jurors. Although Goldman was prevented from re-challenging jurors already (improperly) challenged by Nelson, Goldman received the benefit of the other challenges raised by Nelson with which Goldman was not charged. Goldman was not unlawfully deprived of his right to peremptorily challenge any juror because he, like Nelson, had engaged in a pattern of discriminating against the reseated jurors based on their race. Since | .¡(¡Goldman was not prejudiced by the denial of his motion to sever, this assignment of error is without merit.
 

 CONCLUSION
 

 For the foregoing reasons, the convictions and sentences of Defendants, Glen Dale Nelson and Melvin Goldman, are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . There was testimony that marijuana was being used at the residence, and many of the people present had prior criminal convictions.
 

 [2]
 

 . This case does not concern the disposition of any challenges for cause.
 

 [3]
 

 . The judge rejected a
 
 Batson
 
 challenge made by Defendants.
 

 [4]
 

 . This 12-person jury was composed of 9 white females, 2 black females and 1 white male.
 

 [5]
 

 . Once the challenged party has offered a race-neutral explanation for the peremptory challenges and the trial judge has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the challenger had made a
 
 prima facie
 
 showing becomes moot.
 
 Hernandez, supra.
 

 [6]
 

 . Refusal to allow either Defendant to challenge the reseated jurors arguably falls under
 
 *658
 
 stlier corrective action” in La. C. Cr. P. art. 795. Since the article allows the reseating of an improperly stricken juror, which is, effectively, the denial of a peremptory strike, the article seems to allow the denial of a peremptory strike as to any juror for whom the evidence supplies no valid race-neutral reason for a strike. While some of the Defendants' proffered reasons may find some basis in the record, the trial court remains vested with discretion in the decision whether to credit or discredit those reasons.
 
 See Elie, supra, citing Hernandez, supra.
 
 It is apparent in the case
 
 sub judice
 
 that the trial judge discredited any plausible or facially race-neutral reason for the Defendants' challenges to the reseated jurors, a decision which, again, requires much deference on appeal.